## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA**

**v.**

**JORDAN DUKES,**

     **Defendant.**

**CRIMINAL ACTION FILE**

**NO. 1:19-cr-0414-RWS-AJB**

### UNITED STATES MAGISTRATE JUDGE'S
### FINAL REPORT AND RECOMMENDATION

Defendant Jordan Dukes is also named in Case No. 1:18-CR-0054-RWS-AJB. He previously moved in this case to adopt his motions filed in No. 1:18-CR-0054-RWS-AJB, [Doc. 10], which the Court granted. [Doc. 12]. The Court has now issued a final report and recommendation in No. 1:18-CR-0054-RWS-AJB, attached hereto as Exhibit A, and the recommended rulings in that case are fully applicable to the adopted motions filed by Dukes in this case.

The Court has now ruled upon, or recommended a ruling upon, all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014). As a result, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this 11th day of March, 2022.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **CHRISTOPHER HEARST,** | **CRIMINAL ACTION FILE** |
| **CEDEVONTE' HENRY, and** | |
| **JORDAN DUKES,** | **NO. 1:18-cr-054-RWS-AJB** |
| **Defendants.** | |

<u>**UNITED STATES MAGISTRATE JUDGE'S**</u>
<u>**FINAL REPORT AND RECOMMENDATION**</u>

Pending before the Court are the following the following pretrial motions:

- Christopher Hearst's motion and amended motion to suppress historical cell-site locational data, [Doc. 46, 60];

- Christopher Hearst's motion and amended motion to suppress evidence, [Docs. 47, 59];

- Christopher Hearst's motion and amended motion to suppress identification testimony, [Doc. 49, 137];

- Christopher Hearst's motion to sever defendant and exclude out-of-court statement of co-defendant, [Doc. 51];

EXHIBIT A

- Christopher Hearst's motion and amended motion to dismiss Counts Two, Four, Six, and Eight, [Docs. 52, 62];

- Cedvonte' Henry's motion to suppress cell site data, [Doc. 56];

- Cedvonte' Henry's motion to dismiss Counts Four, Six, and Eight, [Doc. 57]; [1]

- Christopher Hearst's amended motion to suppress evidence, [Doc. 70];

- Jordan Dukes' motion to suppress evidence, [Doc. 146];

- Jordan Dukes' motion to suppress cell phone data, [Doc. 147]; and

- Jordan Dukes' motion to suppress DNA evidence, [Doc. 148].

The Court will group the motions where appropriate and discuss them below.

---

[1]     Henry also filed a pro se "Amendment to Counsel's Motion to Suppress," [Doc. 191], and a "Pro Se Motion of Defendant Cedvonte Henry Pursuant to Fed. R. Crim. P 12(b)," [Doc. 204], which the Court construes as a motion to strike Counts Five, Nine, Eleven, and Thirteen.  Since Henry is represented by counsel, these motions are a nullity and the undersigned **RECOMMENDS** that they be **DENIED**.  LCrR 57.1(D)(3).  The Court also observes that ECF No. 191 does not specify what evidence it seeks to suppress, nor the reasons why any such evidence should be suppressed, and thus is also subject to denial on those grounds.  **Error! Main Document Only.***United States v. Cooper*, 203 F.3d 1279, 1284, 1285 (11th Cir. 2000); *United States v. Richardson,* 764 F.2d 1514, 1527 (11th Cir. 1985); *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984).  And despite Henry's pro se filing, the Court has fully addressed the grounds of ECF No. 204 in Part V.

2

## I.   **MOTIONS TO SUPPRESS HISTORICAL CELL-SITE INFORMATION, [DOCS. 46, 56, 60, & 147]**

The Court previously recommended denial of Hearst's and Henry's motions to suppress evidence of historical cell-site information obtained by a court order issued under 18 U.S.C. § 2703(d), on the grounds that the governing law in this Circuit at the time that law enforcement obtained the orders and prior to the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. __, 138 S. Ct. 2206 (2018), did not require search warrants to obtain historical cell-site data.   [Doc. 66 at 2-3 (citing *United States v. Davis*, 785 F.3d 498, 518 (11th Cir. 2015) (en banc))]; *see also United States v. Green*, 981 F.3d 945, 957-58 (11th Cir. 2020) (applying good faith reliance upon *Davis* and holding that at the time of the issuance of the cell-site orders issued in that case (five years before *Carpenter*), "there was no reason for the officers to believe there was a reasonable expectation of privacy to such records such that they would need a warrant supported by probable cause to acquire them").[2]   The District Judge adopted the recommendation that good faith saved the cell-site data obtained by order from

_____

[2]     In his motion to suppress cell phone data, Defendant Dukes argues that the good faith exception to the Fourth Amendment does not or should not save the historical cell-site data orders issued in this case. [Doc. 147 at 4].  As the Court is bound by *Green* and *Davis*, the undersigned **RECOMMENDS** that Dukes' motion to suppress, [Doc. 147], be **DENIED**.

suppression, but referred the motions back to the undersigned to address other points raised therein. [Doc. 76].

Turning to the unaddressed portion of their motions, although they cite to no legal authority in support and make only a passing reference to the issue,[3] Hearst and Henry contend that historical cell-site information is beyond the scope of information and records for which a § 2703(d) order may be issued. [*See* Doc. 46 at 2; Doc. 56 at 4; Doc. 60 at 5]. Section 2703(c)(1) of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 et seq., permits an electronic communication service provider "to disclose [to a government entity] a record or other information pertaining to a subscriber to or customer of such service" when the government entity obtains an order (that is, prior to *Carpenter*) under § 2703(d). Every court that has addressed the issue has concluded that cell-site data is included within "a record or other information pertaining to a subscriber to or customer of such service." *United States v. Rogers*, 71 F. Supp. 3d 745, 751 (N.D. Ill. 2014) ("The Court concludes that the disclosure of electronic location evidence is authorized

---

[3]       As such, the arguments are subject to being denied on that ground alone. When a party makes only a passing reference or fails to offer argument on an issue, the issue is deemed abandoned. *Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1145 (11th Cir. 2010); *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

under the SCA, and was properly disclosed here."), *aff'd sub nom. United States v. Curtis*, 901 F.3d 846 (7th Cir. 2018); *United States v. Madison*, No. 11-60285-CR, 2012 WL 3095357, at *7 n.6 (S.D. Fla. July 30, 2012) (Rosenbaum, J.) ("As information pertaining to a subscriber and as a record of telephone connections, times, and durations, cell-site location data fulfills the requirements of  Sections 2703(c)(1) and (2).") (citing cases).[4]  The Court agrees with these authorities and thus Hearst's and Henry's scope-of-§-2703 argument should be rejected.

As a result, the Court **RECOMMENDS** that Hearst's and Henry's motions to suppress cell-site data [Docs. 46, 56, 60], be **DENIED.**

---

[4]     The Court surmises that Defendants were basing their arguments on the comparatively limited amount of information required to be disclosed by the electronic communication service provider if the governmental entity only uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena. *See* 18 U.S.C. § 2703(c)(2)(A)-(F).  The Court's duty in construing a statute is to give full effect to each of its provisions, *Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 965 (11th Cir. 2016); *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999).  Accepting Defendants' position would require the Court to ignore § 2703(c)(1)'s explicit use of the term "record or other information pertaining to a subscriber to or customer of such service."

## II.   CHRISTOPHER HEARST'S MOTION AND AMENDED MOTIONS TO SUPPRESS EVIDENCE, [DOCS. 47, 59, 70]

### A.   FACTS[5]

On February 7, 2018, FBI Special Agent Tim Burke arrested Henry at the Economy Hotel in Decatur, Georgia. T144. Henry agreed to be questioned; he thereafter admitted that he participated in several commercial robberies with a person he referred to as "Savage," and indicated that Savage was staying at a nearby

---

[5]   The testimony on Hearst's motions to suppress is contained in two transcripts. Volume I contains the evidence related to Hearst's establishment of his standing to challenge the search of Room 133 at the Efficiency Lodge and contains pages 1 through 61. [*See* Doc. 107]. Volume II contains pages 62 through 180 and generally covers the merits of the motions to suppress. Since evidence from the "standing" hearing also is relevant to the merits of Hearst's motions, the Court cites to the transcript pages in both volumes rather than the volume numbers, *i.e.*, T25, T134, etc.

Also, because the evidence demonstrated that Hearst, albeit under an alias, was staying in Room 133 of the Efficiency Lodge, he has "standing" to challenge any searches conducted of that location. T233; *see Stoner v. California*, 376 U.S. 483, 486 (1964); *United States v. Newbern*, 731 F.2d 744, 748 (11th Cir. 1984) ("Although the room was registered under an alias, appellants had complete control over the room. No other persons were in possession of keys to the room. Appellants' use of the motel room strictly for lodging provides the same expectation of privacy as would their home.") (citation omitted); *United States v. Rocher*, No. 217CR107FTM99MRM, 2018 WL 1071892, at *2 (M.D. Fla. Feb. 26, 2018) (finding defendant had legitimate expectation of privacy in motel room he rented under an alias); *see also Moberg v. State*, 810 S.W.2d 190, 194 (Tex. Crim. App. 1991) ("Notwithstanding the appellant in this particular case registered under an alias, we fail to perceive how that standing alone diminished appellant's expectation of privacy in the room he had let.").

Efficiency Lodge in south DeKalb County.   T144-45.   Henry also referred to Savage as "Devante Hugh."   T146.[6]   He described Savage as having two "H" tattoos on his face and stated that he was a member of the "G-Shan" gang.   T145. He identified Savage when shown surveillance or BOLO photos.   T148, 196-97.[7] Henry wrote "Savage" and "Devante Hugh" on the back of the BOLO photograph. T199; Def. Exh. 4.  Henry also drew a map of the Efficiency Lodge for Burke and the location he believed Savage was staying.   T199-200; Def. Exh. 3.  He also stated he went to high school with Devante Hugh.   T201.

Henry's girlfriend was interviewed separately and prior to Henry being interviewed.   She identified the person in BOLO or surveillance photos as the person she knew as "Savage" and that he stayed at the Efficiency Lodge.   She further stated that she had been with him the week before being interviewed.   T147.

───────────────

[6]     "Savage" and "Devante Hugh" were researched in various law enforcement databases with negative results.  T146, 201-02.  However, a DeKalb County Police Department's database contained a reference to a "Devante" and "Savage" with a last name of "McTure."  T149.  Additional research by Burke led him to conclude that McTure was likely still in Georgia prison and therefore not the suspect for whom they were looking.  T150.

[7]     The person depicted in the BOLO photographs wore a hoodie or a hat. T223; Govt. Exh. 19; Def. Exh. 4.

7

Burke then obtained from the DeKalb County Police Department a room roster of the guests at the Efficiency Lodge, as well as the contact information of the property manager at that location.  T150, 202.

On February 8, 2018, before 9:00 AM, Burke came to the Efficiency Lodge on Flat Shoals Road in Decatur, Georgia, and met with the property manager.  T17-18, 71, 152-53.  He was accompanied by seven other FBI agents and task force officers in four unmarked cars, and a Conyers police detective in an unmarked vehicle them joined mid-morning.  T153.  Burke showed the manager a photograph of a black male from the BOLO, but the manager did not think that she recognized him.  T19-20, 22, 157-58, 204-05, 206.[8]  The property manager advised Burke that a weekly room check needed to be performed, and if the employees located the person they were talking about, they would tell him.[9]  T23-24,  89, 90, 158-59, 163-64, 227.  Burke gave her no instructions as to conducting the room checks.  T92.

_____

[8]     The BOLO photo that Burke showed the property manager did not contain the word "Savage" on it.  T205.

[9]     The room checks involved determining if smoke detectors were in working condition and looking for the presence of bedbugs.  In checking for bedbugs, the lodge's employees use a flashlight to look for blood spots, and pull back the sheets, examine the mattress seams, and lift up the mattress.  They also check the headboard, baseboard, box spring, and bed rails.  T24-25.  They further check to make sure that the room is being kept clean, but they do not open drawers.  T33.

Burke left his cell phone number with the property manager and went back to his vehicle to resume surveillance.  T159.  The other surveillance vehicles also were positioned in the area.  T104-05, 121-22, 162-63.

The property manager and other employees began doing room checks, beginning with Room 101.  T90.  A little later, the property manager brought the desk clerk out to the parking lot to meet with Burke, and after Burke showed the desk clerk the BOLO photo, she told him that she thought that she recognized the person as "Savage," that he was staying ("hung out") in Room 133, and she had seen him as recently as the day before.  T20, 23, 32, 159-60, 206-07.   Henry had provided Burke with a map of the Efficiency Lodge pointing to where Savage was staying, and after the desk clerk told Burke about Room 133, Henry's map made more sense to Burke.  T162.

It took 30 to 45 minutes for the lodge employees to get to Room 133 to perform a room check.  T90-91. [10]  According to the rental roster from the Efficiency Lodge, Room 133 had been rented on November 18, 2017 by "Ronald Tyus." T28-30, 40-41, 192; Govt. Exh. 18.  Only one person was reportedly staying

---

[10]     The property manager testified that the management was not as concerned about bedbugs in the rooms with long-term guests, but only those who checked in most recently or where there was a lot of foot traffic.  T91.

in the room.  T44. Around noon, when the property manager entered Room 133, no one was present but she observed ammunition and a digital scale on the dresser, as well as drug paraphernalia in a drawer that was ajar.  T24, 35, 71, 78-79, 89.[11], [12]  In conducting a bedbug check, a long gun was observed under the mattress, and although her testimony on this issue was not straightforward or clear, the property manager stated that after she called Burke, Burke instructed her to photograph the items and send them to him, which she did. She then continued on performing room checks on the first level of the Efficiency Lodge.  T24, 25, 39, 64, 92, 165, 228-29 (Burke testifying that the property manager simply texted him the photos).

A little later, Burke heard via radio from a member of the surveillance team that a black male was observed going into Room 133, where he stayed for only a few minutes.  T166, 214.  Burke rode around to the area of Room 133 and saw the male carrying black trash bags out of the room, but Burke was able to determine that the individual was not the person from the BOLO that they were looking for. T168, 216.  The male carried the bags over to the Waffle King, a nearby business,

---

[11]     This was the first time that the property manager could recall that she personally performed the room check on Room 133.  T46-47.

[12]     The property manager also recalled seeing items of clothing and four or five cases of beer.  T80.

walking through a break in the fence line between that property and the Efficiency Lodge. T213-14.[13]  Burke then heard over the radio from the Conyers police officer that the male who was carrying the bags entered a gray Mazda 2 automobile that was in the vicinity of the Waffle King and that he saw that another black male was seated in the rear seat but could not get a good look at him.  T105, 106, 124-25, 168-69, 170, 217.  Burke gave the order to follow the vehicle.  T169.

The Mazda left the Waffle King parking lot and drove through the drive-through lane at a Checkers restaurant without stopping to pick up food, and passed directly in front of where Burke had parked.  T170-71, 218-19, 220.  As the Mazda made a slow left-hand turn, from a distance of about 25 feet, Burke identified the backseat passenger as the person they were looking for, based on his facial tattoos. T171-72, 220, 224.  Burke broadcast his recognition to the other law enforcement officers.  T172.

The Mazda then turned into the parking lot of This is Wings.  T172-73.  Law enforcement converged on the vehicle and the person soon identified as Hearst, located in the back seat of the vehicle, was arrested, T110-11, 174.  Also detained was the person Burke had observed carrying the bags out of Room 133, identified

_____

[13]     A number of people were observed using this foot path during the FBI's surveillance on February 8.  T213.

as Jarius Childs. T174. When asked his name, Hearst responded, "Lawyer." T176.
A biometric application scanner identified the person as Hearst, and that he had an
outstanding warrant for failure to appear in Fulton County. T177, 179-181, 182-
83; Govt. Exh. 14.

Childs, who was driving the Mazda, told Burke that he had just met Hearst
and only knew him as "Savage." T183. Childs stated that his girlfriend
(Ms. Felton) and Hearst's girlfriend, who Childs knew only as "Poot," were friends.
T184. Childs reported that at about 11:30 AM, his girlfriend asked him to pick up
"Poot" and Hearst from an apartment complex near a gas station on Candler Road,
and to go to the Waffle King, where Hearst's girlfriend went into a room at the
Efficiency Lodge to pick up a wallet and cell phone. T184-85.[14] After she returned
to the vehicle, "Poot" was dropped off at her work at the Popeyes restaurant in close
proximity to the Efficiency Lodge. T185. At some point thereafter, Hearst told
Childs that he could not show his face in DeKalb County and asked him to go to
Room 133 of the Efficiency Lodge and retrieve his belongings. T48, 187. Childs
told Burke that they parked in the vicinity of the Waffle King and that he went to

---

[14]   Burke testified that he had not seen the woman later identified as
Hearst's girlfriend until she was interviewed later that day, and speculated that law
enforcement must not have been focused on Room 133 at the time she went into
that room. T186.

Room 133 and retrieved Hearst's belongings, including a gun.  T187.  They were arrested a few minutes later.  T188.  Childs denied being involved in any of the robberies and Burke concluded that he was not one of the persons pictured in any of the surveillance videos of the robberies.  T188.[15]  Childs also stated that the bags and the gun he retrieved from Room 133 were on the front seat of the vehicle, with the gun partially concealed by a t-shirt and protruding from a black garbage bag.  T188, 189-90, 226.  Childs stated that the bags were not his and that he did not want them.  T195-96.

The gun was rendered safe, but the bags were secured and not searched at that time.  T190.  They subsequently were searched by search warrant.  T191 (*see infra* beginning at 16).[16]

---

[15]     Childs also stated that another firearm located in the Mazda belonged to his girlfriend, and after running the gun to see if it was stolen, it was replaced where it was found under the seat.  T188.

[16]     The bags were found to contain ammunition and various items of clothing that appeared to match clothing worn during the robberies as shown by surveillance videos and still photos.  T192.  A Georgia identification card in Tyus's name also was located in one of the bags.  *Id.*  Tyus was contacted and advised that he lost his wallet in November 2017 and thereafter some fraudulent charges were made.  T192-93.  He stated that he filed a police report, which Burke was able to confirm, and Tyus additionally stated that he had not stayed at the Efficiency Lodge.  T193.

After the Mazda was stopped and Hearst was arrested, FBI Special Agents Greene and Charles went to the Popeyes on Candler Road to interview "Pooh" (Portia Bryant), Hearst's girlfriend who worked at the Popeyes. T112. She acknowledged that she was staying in Room 133 of the Efficiency Lodge with Hearst, and she accompanied the agents to the Efficiency Lodge. T112-13, 130-31, 137.

After returning to the Efficiency Lodge with Bryant, Greene met with the property manager. He told her that they had arrested a person for serial armed robberies that they believed had been staying in Room 133. T114. The property manager advised that she already knew that since she had spoken earlier with Burke, and because she heard a commotion in the parking lot behind the front office, and when she looked, she saw that Hearst had been arrested. T77, 114. Greene asked the manager, since it looked like the occupant of Room 133 had left with all of his belongings, what she was going to do about the room, and the property manager stated that she was going to evict him due to abandonment if there was no sign that anyone was still staying there. T115, 131, 137. Green asked if he could go if she was going to the room to see if anyone was in there, and she stated that he could. T115. She told Greene that, on the other hand, if any belongings were located there, they would hold onto them for thirty days and then discard them. T115.

14

Sometime between 2:00 and 3:00 PM, the property manager, the desk clerk, the head cleaner, and Greene went to Room 133.  The door to the room was open. Greene entered first to clear it.  T68, 78, 80, 117, 132.  The property manager wanted to check its condition and make sure that nothing was left there.  T81-82, 93.  No one from Efficiency Lodge had entered Room 133 since the earlier room check.  T94.  Upon entering, the property manager saw that the items that she previously saw in the room were not there except for rubber gloves and trash.  T94. The clothing and luggage were gone.  T138.  The mattress had been flipped (she had placed it back down after completing the room check and photographing the firearm) and the firearm she saw previously was not there.  T95.  Greene looked around the room.  T82.  He saw a single round of rifle ammunition on the floor. T132.  He also saw two nine millimeter pistol rounds, latex gloves, mini zip-lock bags, and 23 .22 caliber rounds  in an open drawer in the bedroom area.  T132-33, 135.  Greene seized those items.  T140.

Greene then went to the office with the property manager.  He spoke to her about her qualifying for a reward. T122, 139.  However, the property manager testified that stated that she might have been advised of the possibility of a reward by Burke before she took the photographs.  T69, 83-84, 85-86, 89 (testifying that she did not recall if it was before or after offer to conduct a room check), 117.

15

Burke testified that he spoke to her about the reward two or three times after February 2018.  T194.  She received a $500 reward in July 2018.  T70, 195.

Greene also obtained a copy of the room registration that included a copy of Tyus' driver's license.  T118.  He and Agent Charles took Pooh back to the Popeyes.  T119.

On February 10, 2018, Room 133 room was declared vacated by the Efficiency Lodge through eviction.  Def. Exs. 5, 6; T28-30, 37-38.  The rent was current on the room at the time of the eviction.  T46.

As to a backpack and the four plastic bags seized from the Mazda 2, Burke swore to an affidavit that resulted in the issuance of a federal search warrant.  Govt. Exhs. 16 (warrant), 17 (affidavit).  In the affidavit, Burke averred that on January 8, 2018, a Family Dollar store in Union City, Georgia was robbed by three unidentified black suspects.  Robber 1 was a black male wearing a black skullcap, a red scarf covering his face, a brown and plaid striped jacket, and black pants, and who brandished a handgun with an extended magazine.  Robber 2 was a black male wearing a black mask, a black hoodie with the words "Been Broke Before," and red sweatpants, and who also brandished a firearm.  Robber 3 stood by the front door and wore a black fitted cap, black hoodie, gray pants with rips in them, and black and white shoes.  The store clerk reported that one robber told him to open

16

the drawer and Robber 2 removed $300 cash from the register.  When the clerk stated he did not have access to the second register, Robber 3 punched him in the mouth.  The robbers fled on foot.  Govt. Exh 17, ¶ 3(a).

Burke also recounted that another Union City Family Dollar store was robbed by two robbers on January 12, 2018.  They both brandished firearms and demanded money from the register, and stole $1500 before fleeing.  Surveillance video revealed that the robbers matched the description of and wore the same distinctive clothing as Robbers 2 and 3 in the January 8 robbery, and Robber 2 had distinctive facial tattoos.  *Id.* ¶ 3(b).

The affidavit continued that a Conyers, Georgia, Family Dollar store was robbed on January 14, 2018 at 2:11 PM by two robbers matching the description and clothing of Robbers 2 and 3 from the earlier robberies.  Robber 2 pointed a handgun with an extended magazine at the store clerk, and both robbers fired their handguns at the direction of the store employees.  They took $534.13 before fleeing, and a witness reported a black male running across the store's parking lot and jumping into the driver's side passenger seat of a 4-door, late model Nissan Pathfinder with a "rusted" hood and roof rack.  The Pathfinder driver appeared to be a female.  *Id.* ¶ 3(c).

With regard to the Conyers robbery, Burke wrote that surveillance videos from that robbery revealed that a silver Nissan Pathfinder with a dark hood and dark passenger side fender entered the parking lot where the Family Dollar store was located. At 1:45 PM, a figure exited the vehicle and walked towards the store, and surveillance videos inside the store showed a female wearing pink shoes, light colored pants, and gray coat enter the store, walk around, and pick items off of the shelf but not purchase any items, before leaving the store and returning to the Nissan. Shortly thereafter, Robbers 2 and 3 exited the Pathfinder and robbed the Family Dollar store while the driver stayed in the vehicle and repositioned it. *Id.* ¶ 3(d).

Burke also advised that a Decatur, Georgia, Waffle House was robbed on January 18, 2018. The robber was reported to resemble Robber 2 from the previous robberies, brandished a firearm, demanded cash from the register, and fled the store with $308. *Id.* ¶ 3(e). Another Waffle House, located in Tucker, Georgia, was robbed the same day by a robber resembling Robber 2 and wearing the same distinctive clothing from the January 8, 12, and 14 robberies. He brandished a firearm with an extended magazine, ordered the victims to the ground, and fled the scene with $250 and a Samsung smartphone. He got into a silver compact Nissan, possibly a Sentra. *Id.* ¶ 3(f).

18

The affidavit also described that on January 19, 2018, two robbers, one wearing Robber 2's distinctive clothes from the previous robberies and another wearing a hooded sweatshirt, robbed a Family Dollar store in East Point, Georgia. Robber 2 demanded money from the cash register but when it did not open, the robbers took a drop box containing $120. *Id.* ¶ 3(g). Then, on January 20, 2018, at 3:47 AM, a Waffle House in Smyrna, Georgia, was robbed when two robbers ran in from the back door. One robber had a Glock pistol with an extended magazine and the other had a silver pistol that was either a Taurus or Berretta. The weapons were pointed at the store's occupants, and after the robbers demanded the register, they fled with the register drawer. Burke averred that the modus operandi and weapons were consistent with the earlier robberies. *Id.* ¶ 3(h).

He also described two robberies on January 23, 2018. The robbery of a CVS in Chamblee, Georgia, was committed by one robber who resembled Robber 2 and wore the distinctive clothing from earlier robberies. Two unidentified robbers fit the description of Robbers 1 and 3. Robber 2 and one of the unidentified robbers brandished a firearm, while the third robber served as lookout. They fled with an unknown amount of currency. *Id.* ¶ 3(*i*). The second January 23 robbery occurred at a Walgreens in Sandy Springs, Georgia, where a robber resembling Robber 2 and wearing the same distinctive clothing brandished a handgun with an extended

19

magazine.  The other two robbers were wearing the same clothing or combination of the same clothing as worn by the second and third participants in the earlier CVS robbery.  One assailant fired two shots at a witness in the parking lot, damaging a vehicle.  *Id.* ¶ 3(j).

Burke also recounted that on that same date, the DeKalb County Police stopped a Nissan Pathfinder matching the distinctive appearance of the vehicle associated with the January 14 Conyers Family Dollar robbery, upon report of a black male fleeing the vehicle following a shooting.  The vehicle was driven by D'Brianne McMillan and was registered to her mother, and McMillan matched the description of the woman observed casing the Conyers Family Dollar just before it was robbed.  McMillan was arrested and the Pathfinder was searched pursuant to a state search warrant.  McMillan's cell phone was located in the vehicle, and a search warrant for her residence resulted in the discovery of a single pink shoe similar to the shoes worn by the female observed during the Conyers robbery.  It also was believed that McMillan had a roommate and the residence looked like it had been gone through and male's clothing was found there.  *Id.* ¶¶ 3(k)-(*o*).

Burke then recounted a January 31, 2018 robbery of a CVS in Smyrna at 9:43 PM by two black males.  One robber wore red pants, red tennis shoes, and a black jacket with a hood, and carried a firearm.  The other robber covered his face

with a white bandana and had a rifle. Burke concluded that the modus operandi, combination of clothing, and body type of the suspects was consistent with the previous robberies. *Id.* ¶ 3(p). He also described a February 3, 2018 4:00 AM robbery of a Waffle House in Acworth, Georgia, where Robber 2 wore a "Been Broke Before" sweatshirt and a second robber wore a dark in color Jordan-brand sweatshirt. The robbers fled on foot after an armed customer fired at them, and they reportedly fled in silver SUV. *Id.* ¶ 3(q). A robbery at a Marietta Waffle House occurred shortly after, at 4:27 AM, by a robber wearing a dark in color Jordan-brand sweatshirt and another wearing a black hooded sweatshirt, blue jeans, and having facial hair and hand tattoos and fitting the general description of Robber 2. They fled in tan or silver GMC with a third person driving the vehicle. *Id.* ¶ 3(r).

Burke continued that, on February 5, 2018, McMillan, while in custody in the Rockdale County Jail, was overheard during a phone conversation with her mother stating that "the other guy" was "somewhere on Candler." *Id.* ¶ 3(s). When McMillan's phone was searched, law enforcement saw a photograph of Henry, who resembled one of the January 14 Conyers Family Dollar store robbers, and his hair (blond dreads or twists) matched the description of the shooter in the DeKalb County January 23 shooting. *Id.* ¶ 3(u). The search of the phone also disclosed

21

searches in applications for GPS directions for Candler Road and a Waffle House directly across the street from the Union City Family Dollar. *Id.* ¶ 3(v).

The affidavit continued that on February 6, 2018, a Waffle House in Sandy Springs was robbed. Robber 2 was described as one of the robbers, having facial tattoos, and wearing red jogging pants and a black hooded sweatshirt. Robber 2 and another assailant departed in what was thought to be a silver Mazda. *Id.* ¶ 3(w).

On that same date, DeKalb County Police received information that Henry was the registered occupant in Room 414 of the Economy Hotel in Decatur. A woman fitting the description of his girlfriend was seen leaving the room. When agents approached her, she confirmed that was where Henry lived. Henry was arrested at the hotel on outstanding state warrants, and a pistol magazine was located in his hotel room. A state search warrant for the room revealed a Glock pistol with an extended magazine and light attachment under the bed. Burke noted that several witnesses to the robberies described an extended magazine, and witness statements and a surveillance video of the January 14 Conyers Family Dollar revealed a robber using a pistol with a light attachment. *Id.* ¶ 3(y).

Henry admitted that he participated in the Chamblee CVS and Sandy Springs Walgreen robberies on January 23, and Henry and his girlfriend stated that Robber 2 was "Savage" and resided at the Efficiency Lodge. Based on the map

22

Henry drew and information from an Efficiency Lodge employee, agents determined that Savage resided in Room 133 of the Efficiency Lodge. *Id.* ¶ 3(z).

Burke then described the events of February 8, 2018, where a person later identified as Childs was observed carrying trash bags from Room 133 and getting into a silver Mazda 2, where a person fitting the description of Robber 2's facial tattoos was in the backseat. When the Mazda was stopped, Hearst was arrested based on a Fulton County warrant for failure to appear. *Id.* ¶ 3(aa). Childs told agents that Hearst told him that he could not show his face and so he went to Room 133 at Hearst's direction to retrieve his belongings. Childs stated that the trash bags and a backpack in the front seat of the Mazda were Hearst's. Several of the bags were not sealed and items of clothing could be seen, and protruding from one of the bags was a shotgun similar in appearance to the one used in the January 31, 2018 Smyrna CVS robbery. Agents also could smell marijuana emanating from inside the backpack. *Id.* ¶ 3(bb).

**B.    DISCUSSION**

Hearst makes several arguments as to his arrest, the searches of Room 133, and the searches of the bags in the Mazda.

1.    He first argues that the search warrant for the bags in the Mazda was invalid and he was entitled to a hearing pursuant to *Franks v. Delaware*,

23

438 U.S. 154 (1978), because the affidavit omitted that Henry told the agents that "Savage" was known to him as "Devante Hugh." [Doc. 70 at 6]. The Court disagrees. A defendant seeking a *Franks* hearing must make a "substantial preliminary showing" that (1) an affiant applying for a search warrant made intentionally false or recklessly misleading statements, and (2) those statements were necessary to the finding of probable cause. *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014). The defendant's substantiality requirement "is not lightly met." *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006). Allegations of deliberate falsehood or reckless disregard for the truth "must be accompanied by an offer of proof." *Id.* In addition, the defendant must show that, if the misrepresentations were removed from, or the omitted facts were included in, the warrant affidavit, then probable cause would be lacking. *United States v. Mathis*, 767 F.3d 1264, 1275 (11th Cir. 2014) (involving omissions); *Barsoum*, 763 F.3d at 1329 (involving misstatements). If the warrant would still support probable cause, then no *Franks* hearing is necessary. *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013).

Here, Hearst did not demonstrate that Burke either intentionally misstated or recklessly omitted Henry's identification of "Savage" as "Devante Hugh." Moreover, this omission did not affect the existence probable cause. In the search

24

warrant context, probable cause exists when, under the totality of the circumstances,

"there is a fair probability of finding . . . evidence [of a crime] at a particular

location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).  There

was ample probable cause to search the backpack and the plastic bags.  Henry stated

that he participated in armed robberies with Savage.  Henry and his girlfriend told

agents that Savage stayed in Room 133 of the Efficiency Lodge, and Childs stated

that Savage directed him to retrieve Savage's belongings from that room because

he could not show his face.  Agents observed Childs retrieve the items and place

them in the Mazda.  Burke recognized the backseat passenger of the Mazda that

Childs was driving as Robber 2 based on his facial tattoos.  Childs stated that the

backpack and the plastic bags were Savage's, clothing and a rifle similar to one

used in one of the robberies were visible, and the backpack had an aroma of

marijuana.  Burke stated in his affidavit that in his training and experience and

discussions with other law enforcement officers, persons engaging in commercial

robberies conceal in their residences currency and proceeds of robberies as well as

firearms and clothing utilized in the robberies, Govt. Exh. 17, ¶¶ 3(a), (b), which

opinion was corroborated by the discovery in McMillan's residence of at least one

pink shoe worn by her during one of the robberies in which she participated.

Hearst's true identity was discovered as a result of a fingerprint scan on the scene

25

of his arrest.  As a result, probable cause to search the bags and backpack existed independent of Burke's omission of Henry's statement that he thought Savage's real name was Devante Hugh.

           2.      Hearst also argues that the stop of the Mazda, his arrest, and the seizure of the items from the Mazda were tainted by illegal warrantless intrusions into Room 133, because the property manager acted as an agent of the government when, at the behest of the FBI, she entered Room 133 without a search warrant and took and conveyed to Burke photographs of the items in the room.  [Doc. 142 at 15-16].  The Court disagrees.  First, even assuming for the moment that Room 133 was searched unlawfully, as shown in the preceding paragraph, independently there was more than enough probable cause to stop the vehicle and arrest Hearst based upon the surveillance videos from the robberies, Henry's (and his girlfriend's) statements that he helped "Savage" commit commercial robberies and "Savage" stayed at the Efficiency Lodge, the front desk clerk's statement that the person in the BOLO stayed in Room 133, the observations of Childs carrying bags out of Room 133, and Burke's identifying Hearst in the backseat of the Mazda as Robber 2.  Then, these facts when combined with Childs' post-stop statements about retrieving the bags from the room on Hearst's directions, provided enough probable cause to obtain a warrant for the bags found in the Mazda.

Even if there was not sufficient probable cause at first, there certainly was enough reasonable suspicion based on these facts to allow the Mazda to be stopped, *see United States v. Arvizu*, 534 U.S. 266, 273 (2002) (investigatory stop of vehicle justified if supported by reasonable suspicion to believe that criminal activity has occurred or is occurring); *United States v. Hensley*, 449 U.S. 221, 232 (1985) (stop justified on reliance on "wanted" flyer or bulletin); *Thomas v. Newsome*, 821 F.2d 1550, 1553-54 (11th Cir. 1987) (same). The reasonable suspicion then ripened into probable cause for Hearst's arrest when his fingerprint was taken and matched the person for whom an outstanding arrest warrant had issued. *Hayes v. Florida*, 470 U.S. 811, 816-17 (1985); *Adams v. Williams*, 407 U.S. 143, 146 (1972); *United States v. Ware*, No. 215CR335RDPTFM1, 2016 WL 10893748, at *2 (M.D. Ala. Mar. 7, 2016) (noting that "courts have consistently rejected the notion that obtaining fingerprints from a lawfully-detained individual is an unreasonable search and seizure for Fourth Amendment purposes") (citing cases).

3.     The warrantless intrusions into Room 133 were not unlawful. The first intrusion was the property manager's entry to perform room checks and her sending photographs of what she observed to Burke. "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *United States v. Fisher*,

No. 19-14423, 2021 WL 6101255, at *4 (11th Cir. Dec. 21, 2021) (quoting U.S. Const. amend. IV).   However, "[t]he Fourth Amendment proscribes only governmental action—it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official." *United States v. Runyan*, 275 F.3d 449, 457 (5th Cir. 2001) (quoting *United States v. Jacobsen*, 469 U.S. 109, 113 (1984)) (internal quotation marks omitted); *see United States v. Meister*, 596 Fed. Appx. 790, 792 (11th Cir. Jan. 2, 2015) (same); *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003) (holding that because the Fourth Amendment "does not provide protection against searches by private individuals acting in a private capacity[,] . . . evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.") (citation and internal quotation marks omitted); *United States v. Bomengo*, 580 F.2d 173, 175 (5th Cir. 1978)[17] ("The Fourth Amendment proscribes only governmental action.  A search by a private individual for purely private reasons does not raise Fourth Amendment implications.").

---

[17] Error! Main Document Only. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

"A search by a private person does not implicate the Fourth Amendment unless [s]he acts as an instrument or agent of the government." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003) (citing *United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985)).  "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, . . . a question that can only be resolved 'in light of all the circumstances,' " *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)).  In order "for a private person to be considered an agent of the government, [courts] look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Steiger*, 318 F.3d at 1045 (citing *United States v. Simpson*, 904 F.2d 607, 610 (11th Cir. 1990)) (internal citations omitted); *see also Jacobsen*, 466 U.S. at 115 ("The initial invasions of respondents' package were occasioned by private action. . . .  Whether those invasions were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character."); *United States v. Emile*, 618 Fed. Appx. 953, 955

(11th Cir. June 29, 2015) (noting that the "knowledge and acquiescence" criteria "encompass the requirement that the government agent must also affirmatively encourage, initiate or instigate the private action") (citing *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996)).

The Court concludes that the property manager was not an agent of the government when she entered Room 133 to conduct a room check. While the government certainly had knowledge of and acquiesced in the property manager's entry into Room 133, the property manager advised Burke that a room check needed to be performed, that it was a regular practice at the location, and that if the employees located the person they were talking about, they would tell him. T23-24, 89, 90, 158-59, 163-64, 227. Burke left his cell phone number with the property manager and went back to his vehicle to resume surveillance. T159. Burke gave the property manager no instructions as to how to conduct the room checks, T92, which the property manager explained involved some intrusive inspection and sometimes manipulation of the bed, mattress and box springs. *See supra* at 8 n.9. As in *Emile*, 618 Fed. Appx. at 955, where the court found no government agency since the agent did nothing to significantly encourage UPS to open the packages that smelled of marijuana, Burke did nothing to significantly encourage the property manager to enter Room 133 and conduct this intrusive

30

examination.    In  fact,  Burke  questioned  her  about  the  room  checks  and  the

regularity of the procedure.  T90 (property manager testifying that Burke asked her

whether the check would be out of the ordinary and she responded that it was done

every week), 158 (she was due to do her weekly room checks, and volunteered that

she does the checks), 159 (Burke giving her his cell phone number in the event she

encountered the Room 133 occupant).  Burke did not participate by going into the

room or direct her what to do once she got in there.

It is true that the property manager testified, although not consistently, that

Burke told her to photograph what she already told him she observed, *compare* T92

(the  property  manager  first  stating  that  she  was  not  sure  if  she  was  told  to

photograph what she saw before stating that she was, but then stated she was told

to do so) *with* T165 (Burke testifying that he received the photos in a text message

without prompt); and this makes this a closer question.  The Court's research has

not located an Eleventh Circuit case discussing which party has the burden of proof

on this issue, but the Seventh Circuit has held that the defendant bears the burden

of proving that a private person was acting as a government agent.  *United States*

*v. Ginglen*, 467 F.3d 1071, 1074 (7th Cir. 2006) (citing *United States v. Shahid*,

117 F.3d 322, 325 (7th Cir. 1997)).  The Court finds that placement of the burden

on the defendant is appropriate.

31

On this mixed record, Hearst has not satisfied his burden that the property manager was acting as a government agent.  First, there is no evidence that she was acting as a government agent when she went into the room to conduct her checks. She testified that this was part of her normal duties, and while it may have at times been done irregularly by *her* because of her other responsibilities, the record is undisputed that room checks was a regular activity of the business, as was what the Efficiency Lodge's employees did and were looking for when they conducted room checks.   Specifically, in conducting the room checks, lifting the mattress and closely inspecting it for bedbugs was part of the room check.  Thus, the property manager's entry into Room 133 was to further her own ends.  *Steiger*, 318 F.3d at 1045.  Thus, Hearst did not establish the first prong of transforming a private search into governmental action.

Second, the lack of consistent testimony from the property manager as to whether she was directed by Burke to take the photographs leads to the conclusion that she was not acting as a government agent.  While the record was stronger in the government's favor in *United States v. Stokes*, No. 1:14-CR-290-TWT-JKL, 2017 WL 3493053, at *10 (N.D. Ga. June 23, 2017), *report and recommendation adopted*, No. 1:14-CR-290-1-TWT, 2017 WL 3481680 (N.D. Ga. Aug. 14, 2017), where the witness testified that photos were taken on her own volition, the record

in the present case is not sufficient to demonstrate that Hearst met his burden of showing governmental action.  The Court also fails to see a material difference between the property manager's simply informing Burke of her findings in the room and his direction (assuming he gave one) to her to photograph what she observed, where Burke did not direct her to search or how to search the room.  The Court further notes that Hearst's post-hearing brief argues that the property manager's intrusion tainted law enforcement's subsequent actions (stopping the Mazda, arresting Hearst, and obtaining a warrant to search the bags), but the Court already has concluded that ample probable cause existed independent of what was observed in Room 133 as a result of the room check.

In reaching this result, the Court is mindful that courts considering the private-person/government-agent issue have taken into account whether the government offered a reward.  *United States v. Mosley*, No. 3:04-CR-296-J32TEM, 2005 WL 2756247, at *2 (M.D. Fla. Oct. 25, 2005) (quoting *United States v. Malbrough*, 922 F.2d 458, 462 (8th Cir. 1990)).  Again, the property manager did not consistently testify that the topic of a reward was broached *before* her entry into

Room 133, and the Court finds Burke's and Greene's testimony credible that such a discussion occurred after she entered Room 133 and Hearst was arrested.[18]

_____

[18]    Because the Court concludes that the entry into Room 133 was not government action that necessitated first getting a search warrant, it need not discuss at length Hearst's argument that it was the property manager's unlawful discovery that focused law enforcement on Room 133.  The Court construes Hearst's argument to be a variation of the "independent source" doctrine.  "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."  *United States v. Maxi*, 886 F.3d 1318, 1329 (11th Cir. 2018) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).  The Eleventh Circuit analyzes whether an independent source exists to support a search warrant in two steps:

> First, we excise from the search warrant affidavit any information gained through the arguably illegal initial search and determine whether the remaining information is enough to support a probable cause finding.  Second, if the remaining information establishes probable cause, we determine whether the officer's decision to seek the warrant was prompted by what he had seen during the arguably illegal search.  If the officer would have sought the warrant even without the preceding illegal search, the evidence seized under the warrant is admissible.

*Maxi*, 886 F.3d at 1329-30 (quoting *United States v. Bush*, 727 F.3d 1308, 1316 (11th Cir. 2013) (per curiam) (quotations and citations omitted, alterations adopted). The rationale for the independent source doctrine is that the government should be put "in the same, not a worse, position tha[n] [it] would have been if no . . . error or misconduct had occurred."  *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix*, 467 U.S. at 443)).  Application of this two-step process shows that the evidence obtained in response to the search warrant for the bags is clearly admissible based upon the independent source doctrine.

      First, assuming that the property manager's observations of the items in Room 133 were illegally obtained, what information was included Burke's application for the search warrant for the bags?  The answer is contained in Govt.

34

4.     Finally, the Court rejects Hearst's argument that Greene's seizures from Room 133 following his warrantless entry should be suppressed. While searches and seizures of a hotel room without a warrant are presumptively

---

Exh. 17, ¶ 3(z), where Burke avers that they determined that Savage was staying in Room 133 from information provided by Henry and an Efficiency Lodge employee, but the latter's information must relate to the front desk clerk's telling Burke that the person depicted in the BOLO was staying in that room. The warrant application did not recount any of the property manager's discoveries from inside that room. So, none of the potentially illegally-observed evidence was placed before the issuing magistrate judge.

The second step of the independent source analysis asks whether the agent's decision to seek a search warrant was "prompted by" what was observed during the impermissible search. *United States v. Fleur*, 762 Fed. Appx. 691, 696 (11th Cir. Feb. 20, 2019) (quoting *United States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012)). Here, prior to anything he learned from the property manager's discoveries, Burke had probable cause to believe that Savage had committed several of the armed robberies under investigation, based on the BOLO and Henry's confession, and that the person in the BOLO was staying in Room 133, according to the front desk clerk. Then, Burke observed "Savage" in the backseat of the Mazda, and upon having the vehicle stopped, saw clothing and the firearm protruding from the plastic bags and marijuana odor coming from the backpack. Thus, law enforcement had an independent source separate from any illegal search. Moreover, Burke's recognizing the backseat passenger as "Savage," learning from Childs that Hearst told him to retrieve the items from Room 133, and his seeing the firearm protruding from the plastic bag constituted intervening circumstances that further attenuated the search warrant from any potential illegal entry into Room 133. *See Utah v. Strieff*, 579 U.S. 232, 238 (2016) (describing attenuation doctrine, and holding that evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained") (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

35

unlawful, *Stoner*, 376 U.S. at 486, the prohibition does not apply, however, to situations in which voluntary consent has been obtained from a third party who possesses common authority over the premises.   *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Matlock*, 415 U.S. 164, 171 (1974).  In *Rodriguez*, the Supreme Court held that an officer may receive valid consent to enter a residence from "a person with actual or apparent authority." *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014) (citing *Rodriguez*, 497 U.S. at 186-89).  "A third party has apparent authority to consent to a search if an officer could have reasonably believed the third party had authority over the area searched." *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (citing *Rodriguez*, 497 U.S. at 188-89). "While a landlord generally lacks common authority to consent to a search of a tenant's apartment, a tenant who abandons the property loses any reasonable expectation of privacy he once had[.]" *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (citations omitted). The *Rodriguez* opinion cautioned, though, that an officer cannot accept voluntary consent to enter a residence in all circumstances:

> [W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises.  Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.  As with other factual determinations bearing

> upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' " that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).  If not, then warrantless entry without further inquiry is unlawful unless authority actually exists.  But if so, the search is valid.

*Rodriguez*, 497 U.S. at 188-89.

At the time of his entry into the room with the property manager and other employees of the Efficiency Lodge, Greene knew that Hearst had been arrested, only one person was registered to reside in Room 133, Childs had been told by Hearst to go to Room 133 and get his belongings, the other person presumably staying in Room 133 (Hearst's girlfriend) was no longer on the premises, and the Efficiency Lodge management stated that if the room appeared abandoned, they would terminate the rental.

The question in turn is whether the objective facts demonstrate that Hearst had abandoned the property such that Greene could reasonably conclude that the Efficiency Lodge management had the apparent authority to allow him to enter. While Hearst clearly had a legitimate expectation of privacy in Room 133, "[l]egitimate expectations of privacy can be abandoned."  *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987).  The question of abandonment is one of intent "which can be inferred from words, acts and other objective facts."

37

*Id.* at 1546; *see United States v. Sparks*, 806 F.3d 1323, 1342 (11th Cir. 2015) (this is an objective assessment "based primarily on the prior possessor's intent"), *overruled on other grounds by United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020) (en banc).   Further, "the issue of abandonment for Fourth Amendment standing purposes is not abandonment in the 'strict property-right sense' " but is evaluated applying a " 'common sen[s]e approach[.]' " *Sparks*, 806 F.3d at 1342 (citations omitted).   "[T]he critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*.' " *McKennon*, 814 F.2d at 1546 (quoting *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982)) (emphasis in original).

Here, having instructed Childs to get his belongings from Room 133 and the property manager's observation that (1) the person staying in the room has been arrested (recall that she was told that the FBI believed that someone staying in her property was a serial robber and thus likely believed that upon arrest he would not be returning anytime soon) and (2) that the room had been emptied of clothing and the firearm she earlier saw and all that was left was trash, Greene could reasonably

believe that the property manager had apparent authority to allow his entry into the room and the seizure of whatever items were abandoned therein.

As a result, the undersigned **RECOMMENDS** that Hearst's motion and amended motions to suppress evidence, [Doc. 47, 59, 70], be **DENIED**.

## III.   HEARST'S MOTION AND AMENDED MOTION TO SUPPRESS IDENTIFICATION TESTIMONY, [DOC. 49, 137]

In his amended motion to suppress identification testimony, Hearst seeks an evidentiary hearing "to examine for suggestiveness" the circumstances of any out-of-court identifications of him that either would be referenced at trial or that were made by a witness that identified him as a participant in the charged offenses or similar conduct sought to be admitted under Federal Rule of Criminal Procedure 404(b).   [Doc. 137 at 2-3].   Specifically, he alleges that Henry and Henry's girlfriend were shown one or more BOLO posters, and they both identified the person depicted in the BOLO for a robbery of a Conyers Family Dollar store as "Savage," and Henry made identifications as to other robberies.   [*Id.* at 3].   He further alleges that Henry's girlfriend's first identification occurred at the DeKalb County Police South Precinct on February 7, 2018, in the presence of Burke and an FBI Task Force Officer, and then she was reinterviewed on July 11, 2018 at the DeKalb County Police Precinct by Burke and another FBI Special Agent.   At that time, she again was shown the Conyers Family Dollar store BOLO and recalled

39

having been shown the BOLO previously and identifying "Savage" as the person depicted in the flyer.  [*Id.*].  He then alleges that she was shown a single booking photograph of Hearst and stated that he was the person she knew as "Savage," and that Henry had told her that the robbery photos that he saw on the news looked just like "Savage."  [*Id.* at 4].  He claims that the girlfriend's identification was tainted by a suggestive identification process and hearsay statements from Henry, and that he is entitled to an evidentiary hearing and suppression of her identification of him. [*Id.*].

The Supreme Court established the due process standard against which police identification procedures are to be measured in *Stovall v. Denno*, 388 U.S. 293 (1967).  A violation of due process occurs when, under "the totality of the circumstances," a confrontation procedure is "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).

Courts employ a two-part test for determining whether an out-of-court identification can properly be admitted.  *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015).   First, the Court determines whether the original identification procedure was unduly suggestive.  *United States v. Ford*, 784 F.3d 1386, 1391 (11th Cir. 2015); *United States v. Brown*, 441 F.3d 1330, 1350

(11th Cir. 2006).  A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification.  *Allen v. Estelle*, 568 F.2d 1108, 1113 (5th Cir. 1978).  In this context, "impermissibly," "unnecessarily," and "unduly" suggestive circumstances means "whether the suggestiveness rises to such a level that it undermines reliability. Police machinations can heighten the likelihood of misidentification, but they are no prerequisite to finding a confrontation 'so impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification.' " *Perry v. New Hampshire*, 565 U.S. 228, 254 n.3 (2012) (citing *Simmons*, 390 U.S. 377, 384 (1968)).  Claims that the circumstances of a police identification procedure are so unnecessarily suggestive as to produce irreparable misidentification must be evaluated in light of the totality of the surrounding circumstances. *Nettles v. Wainwright*, 677 F.2d 410, 414 (11th Cir. 1982); *Rudd v. State of Fla.*, 477 F.2d 805, 811 (5th Cir. 1973) ("Pretrial identification procedures should not be found impermissibly suggestive on the basis of rigid application of categorical rules.  For example, indicia of reliability such as a witness's strong recollection from an independent, untainted source may in some cases counteract the suggestiveness in certain identification procedures.  Also, exigencies of efficient police work may occasionally justify

41

identification procedures that in other contexts would be unnecessarily suggestive. Because of these and other variables spanning the range of human experience, courts have wisely counseled against determination of constitutionally impermissible suggestiveness on other than a case-by-case basis."). In *Foster v. California*, 394 U.S. 440 (1969), the Court held that a lineup is unduly suggestive when it is virtually inevitable that the witness will select the individual whom the police have singled out. This rule, unlike the exclusionary rule of the Fourth Amendment, is aimed not at deterring unfair police practices but at the reliability, *vel non*, of the truth-finding process. *Caver v. State of Ala.*, 537 F.2d 1333, 1335 (5th Cir. 1976) (citing *Foster*, *id.*).

The defendant has the burden of showing that the eyewitness identification was derived through "impermissibly suggestive" means. *Perry v. New Hampshire*, 565 U.S. 228, 253-54 (2012); *see also Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). Only after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure. *United States v. Wade*, 388 U.S. 218, 240 & n.31 (1967); *United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994); *United States v. Mustafa*, Crim. Action No. 1:11-CR-0234-1-CAP, 2012 WL 1903255, at *2 (N.D. Ga. May 25, 2012) (Pannell, J., *adopting* Baverman, M.J.). "Determining whether an identification is

so unreliable as to violate due process requires [the court] to answer two (2) questions: (1) whether the original identification procedure was unduly suggestive; and if so, (2) whether the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial." *Marsden v. Moore*, 847 F.2d 1536, 1545 (11th Cir. 1988); *see also United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001) ("This court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification . . . .  First, we must determine whether the original identification procedure was unduly suggestive.  If we conclude that it was suggestive, we then must consider whether, under the totality of the circumstances, the identification was nonetheless reliable.") (citation omitted).  If the identification procedure is not unduly suggestive, "that ends the inquiry." *Williams v. Weldon*, 826 F.2d 1018, 1021 (11th Cir. 1987).  As the Supreme Court more recently reiterated in *Perry*, "[t]he Court adopted a judicial screen for reliability as a course preferable to a *per se* rule requiring exclusion of identification evidence whenever law enforcement officers employ an improper procedure.  The due process check for reliability . . . comes into play only after the defendant establishes improper police conduct." *Perry*, 565 U.S. at 241; *see also United States v. Elliot*, 732 F.3d 1307, 1310 (11th Cir. 2013) (holding that "when no improper law enforcement activity is

43

involved, exclusion of an eyewitness identification is unnecessary").  Following the decision in *Perry*, the district court in *United States v. Henry*, 939 F. Supp. 2d 1279 (N.D. Ga. 2013), stated, "The defendant has the burden of showing that the eyewitness identification was derived through 'impermissibly suggestive' means[,]" and "[o]nly after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure." *Id.* at 1292 (citations omitted).

If the procedures utilized were unduly suggestive, the Court then considers whether, under the totality of the circumstances, "the identification was nonetheless reliable." *Brown*, 441 F.3d at 1350 (citing *Diaz*, 248 F.3d at 1102).  The factors that go into this "totality of the circumstances" test include: the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time elapsing between the crime and the identification. *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991) (footnote omitted).

Absent the defendant making the initial showing of an unnecessary and unduly suggestive procedure, the Court is not required to hold an evidentiary hearing to screen admission of an out-of-court identification or before allowing an in-court identification.  "[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the

44

identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry*, 565 U.S. at 248; *United States v. Whatley*, 719 F.3d 1206, 1216 (11th Cir. 2013) (same).  When a defendant's motion "does not present any basis for the court to conclude that the identification procedure was in any way suggestive[,]" the Court is not required to hold a hearing outside the presence of the jury " 'whenever a defendant challenges the admissibility of a witness's identification.' " *United States v. Vazquez-Velazquez*, Criminal Indictment No. 1:11-CR-212-TCB-GGB, 2012 WL 917845, at *10 (N.D. Ga. Feb. 23, 2012) (citation omitted), *adopted by* 2012 WL 912787 (N.D. Ga. Mar. 16, 2012); *see also Mustafa*, 2012 WL 1904595, at *5 ("The Constitution does not impose a *per se* rule requiring an evidentiary hearing in every case of a claimed improper identification.") (citing, *inter alia*, *United States v. Smith*, 546 F.2d 1275, 1279-80 (5th Cir. 1977) ("holding that '[a]n evidentiary hearing is not required where none of the critical facts are in dispute and the facts as alleged by the defendant if true would not justify the relief requested' ")).

Based on the record and Hearst's allegations in the motion and amended motion, the Court finds that he has not met his burden of demonstrating that the government utilized an unnecessary and unduly suggestive identification procedure in this case.  He makes no argument that the identification procedures were unduly

45

suggestive, stating only that Henry's girlfriend was shown the Conyers Family Dollar BOLO printout at the police station.   There is no allegation that law enforcement did or said anything that suggested to the girlfriend that "Savage" was Hearst or that the person she knew as "Savage" was the person the police wanted. It is true that showing a single photograph, rather than a photo array, can be unduly suggestive.   *See Simmons*, 390 U.S. at 383 (noting that the risk of misidentification is increased if the police show a picture to the witness of only a single individual); *United States v. Cueto*, 611 F.2d 1056, 1063-64 (5th Cir. 1980) (holding that a procedure was unduly suggestive where witness was shown one photograph of the defendant); *Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979) (observing that "a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion").   However, the BOLO photo was not of such quality that it suggested the answer the police wanted.   *United States v. Everett*, No. 1:17-CR-020-RWS-JKL, 2019 WL 6458425, at *8 n.3(N.D. Ga. July 5, 2019) (concluding that store manager's viewing of the surveillance video did not render the identification procedure suggestible because the robber's face is not clearly visible in the video), *report and recommendation adopted*, No. 1:17-CR-20-1-RWS-JKL, 2019 WL 4126657 (N.D. Ga. Aug. 30, 2019).

46

Furthermore, in the initial identification of "Savage" following being shown the BOLO, Henry and his girlfriend made separate, independent identifications. And, the Court finds no undue suggestiveness in the FBI's showing the girlfriend a single booking photo of Hearst, and her confirming that the person depicted was the person she previously identified as "Savage." As the *Perry* Court noted:

> Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do. Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances. For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned "theft suspect," or hearing a radio report implicating the defendant in the crime. Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these circumstances might have "suggested" to the witness that the defendant was the person the witness observed committing the crime.

*Perry*, 565 U.S. at 244. The *Perry* Court recognized that the jury, not the judge, traditionally determines the reliability of evidence. *Id.* at 245. The Court also took into account the safeguards built into the adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability, including (1) the defendant's right to confront the eyewitness through cross-examination, (2) defense counsel's opportunity to expose the flaws in the eyewitness' testimony and focus the jury's attention on the fallibility of such testimony during opening statements and closing arguments, (3) any jury

instructions which warn the jury to take care in appraising identification evidence, (4) the constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt (which impedes convictions based on dubious identification evidence), and (5) evidentiary rules which permit trial judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury. *Id.* at 245-47. For these reasons, the *Perry* Court held that the Due Process Clause does not require a court to determine the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement. *Id.* at 248.

Finally, the fact that later Henry made statements to his girlfriend about "Savage" being the robber is not misconduct attributable to law enforcement, and thus does not implicate Due Process. *Perry*, 565 U.S. at 241; *Elliot*, 732 F.3d at 1310.

As a result, the undersigned **RECOMMENDS** that Hearst's motion and amended motion to suppress identification testimony, [Docs. 49, 137], be **DENIED**.

## IV. HEARST'S MOTION TO SEVER DEFENDANT AND EXCLUDE OUT-OF-COURT STATEMENT OF CO-DEFENDANT, [DOC. 51]

In this motion, Hearst seeks a severance from McMillan and Henry because they made statements implicating him in the charged robberies. [Doc. 51 at 6].

48

Case 1:19-cr-00414-RWS-JEM   Document 29   Filed 03/11/22   Page 50 of 76

McMillan has been convicted, and thus even if her out-of-court statement (to the extent that the statement that one of the other robbers was staying on Candler could be deemed specific to Hearst), the motion as to her statement is moot.

As for Henry's statements that "Savage" committed robberies with him, a different result obtains. In *Bruton v. United States*, 391 U.S. 123, 135 (1968), the Supreme Court held that the admission of "powerfully incriminating extrajudicial statements of a codefendant" violates the Sixth Amendment's Confrontation Clause, even if the court issues an instruction to the jury not to consider the statement as evidence against the defendant. *See United States v. Schwartz*, 541 F.3d 1331, 1348 (11th Cir. 2008). In *Schwartz*, the Eleventh Circuit held that "a defendant's confrontation right is violated when the court admits a codefendant statement that, in light of the Government's whole case, compels a reasonable person to infer the defendant's guilt." *Id.* at 1351 (footnote omitted). In that case, the court found that *Bruton* was implicated by an affidavit that demonstrated that the company the defendant controlled made the suspect loans, and thus the affidavit " 'obviously refer[red]' to" the defendant. *Id.* at 1351-52.

Here, Henry's reference to Hearst as "Savage," plus his hand-drawn map that directed the FBI to the Efficiency Lodge in addition to other evidence, points inexorably to Hearst. Since the Supreme Court "has assumed . . . that nicknames

49

and specific descriptions fall inside, not outside, *Bruton*'s protection, *Gray v. Maryland*, 523 U.S. 185, 195 (1998), permitting Henry's identification of his accomplice as "Savage" violates *Bruton*.

As a result, the Court recommends that if the Government seeks to introduce, in a joint trial with Hearst, Henry's statement that he committed robberies with "Savage," that either the statement be excluded or Hearst be tried separately from Henry.  Therefore, the Court **RECOMMENDS** that Hearst's motion to sever or exclude, [Doc. 51], be **GRANTED IN PART AND DENIED IN PART AS MOOT**.

## V.   HEARST'S AND HENRY'S MOTIONS AND AMENDED MOTION TO DISMISS COUNTS TWO, FOUR, SIX, AND EIGHT, [DOCS. 52, 57, 62, 204] [19]

In Counts Three, Five, Nine, Eleven, Thirteen, and Fifteen, Hearst is charged with using, carrying, brandishing or discharging a firearm during and in relation to the crimes of violence charged in each preceding Count, that is, the Hobbs Act robberies charged in Counts Two, Four, Eight, Ten, Twelve, and Fourteen, in violation of 18 U.S.C. §§ 924(c)(l)(A) and 924(c)(l)(A)(ii).  Henry is charged

---

[19]   Hearst and Henry filed their motions before the indictment was superseded.  [Doc. 110].  The Court considers the motion as relating to the counts charged under 18 U.S.C. § 924(c) in the superseding indictment.

similarly in Counts Five, Nine, and Eleven. They contend that since Hobbs Act robberies under 18 U.S.C. § 1951 are not crimes of violence under the categorical approach mandated by *Johnson v. United States*, 576 U.S. 591 (2015), as extended by *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the § 924(c) counts are subject to dismissal.  [Doc. 62 at 2, Doc. 57 at 2].

Although the Supreme Court deemed 924(c)'s residual clause's definition of a "violent" felony unconstitutionally vague in *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019), the Eleventh Circuit has repeatedly held since *Davis* that Hobbs Act robbery still qualifies as a crime of violence under the elements clause of § 924(c).  *See, e.g.*, *United States v. Buckner*, 808 Fed. Appx. 755, 761 (11th Cir. Mar. 31, 2020) (rejecting claim that *Davis* abrogated *United States v. St. Hubert*, 909 F.3d 335, 345 (11th Cir. 2018), *abrogated on other grounds by Davis*, and holding that *St. Hubert* remains "valid binding precedent" that "a conviction for substantive Hobbs Act robbery categorically qualifies as a crime of violence under § 924(c)'s elements clause"); *United States v. McCant*, 805 Fed. Appx. 859, 863-64 (11th Cir. Mar. 10, 2020) (same); *United States v. McCain*, 782 Fed. Appx. 860, 862 (11th Cir. July 30, 2019) ("Our binding precedent holds that Hobbs Act robbery – the statute underlying both of McCain's predicate convictions – qualifies as a 'crime of violence' under § 924(c)(3)(A)'s elements clause."); *Vega v. United*

*States*, 794 Fed. Appx. 918, 920 (11th Cir. Dec. 23, 2019) ("We are bound by our prior holding in [*In re Saint Fleur*, 824 F.3d 1337 (11th Cir. 2016)] that Hobbs Act robbery is a crime of violence under § 924(c)'s elements clause.").

As a result, the undersigned **RECOMMENDS** that Hearst's and Henry's motions and amended motions to dismiss the § 924(c) counts, [Docs. 52, 57, 62, 204], be **DENIED**.

## VI.   DUKES' MOTION TO SUPPRESS EVIDENCE, [DOC. 146]

### A.   FACTS

Dukes seeks to suppress the evidence obtained from a cell phone seized from his home at the time of his arrest.  [Doc. 146].  The facts from the evidentiary hearing are as follows.

On January 20, 2018, a Waffle House was robbed by two tall, skinny black males.  Both brandished firearms, and one of the firearms had an extended magazine, which was similar to other reported armed robberies under investigation. The robbers took the cash tray out of the register, which also was similar to other robberies.  [Doc. 161 at 6].  Eyewitnesses chased the getaway vehicle and videotaped it on their cellphones, and watched it turn into an apartment complex. [*Id.* at 6-7].  Police went to the apartment complex and located the vehicle, whose hood was warm, and they observed cash on the ground outside the vehicle and the

cash register tray was located in nearby woods. [*Id.* at 7]. The vehicle, a maroon Kia Optima, was registered to Dukes and Deronika Dukes (hereinafter "Mrs. Dukes"). [*Id.*]. The police interviewed Mrs. Dukes, Dukes' mother, who stated that she had not seen her son in several days, that the vehicle was hers and her son's, and she provided a telephone number for him. [*Id.* at 8]. That phone number came back to a Facebook account associated with Dukes, although the phone was in Mrs. Dukes' name. [*Id.*].

On January 23, 2018, at approximately 7:30 PM, a CVS in Chamblee, Georgia, was robbed by two males brandishing firearms. The employees were robbed at gunpoint. A third male stood in the doorway as a lookout and the three perpetrators fled the scene. [*Id.* at 12]. Dukes' cell phone was not active and thus not detected through historical cell site or tower dump information. [*Id.* at 13]. However, Dukes' phone was in communication with Henry's phone, which was in the vicinity of the CVS robbery, within an hour of the robbery. [*Id.*]. Also within an hour of the Chamblee CVS robbery, a Walgreens in Sandy Springs was robbed, and based on their faces and dress, two of the robbers appeared to have also committed the Chamblee CVS robbery. [*Id.* at 14]. FBI Special Agent Paul Costa believed that Dukes was the third individual because he looked the same as the person in CVS robbery because the clothing was the same except that his jacket

53

was removed.  [*Id.*].  Henry later confessed to these two robberies but did not implicate Dukes.  [*Id.*].  Dukes' phone also was in contact with Hearst's phone around the time of the robbery.  [*Id.* at 15].

On January 31, 2018, two back-to-back robberies occurred.  [*Id.*].  A CVS in Smyrna was robbed at about 9:45 PM.  Two individuals entered with a rifle.  One of the assailants turned out to be Hearst.  [*Id.* at 15-16].  The second individual's face was hidden, but he was a tall skinny black male with a jacket and a hood, who pointed a gun at the employees and took the tray from the cash register.  [*Id.* at 16].  Dukes' cell phone was found to be in the vicinity of the Smyrna CVS and in contact with Hearst's cell phone throughout the evening.  [*Id.*].

The second robbery occurred approximately 45 minutes later.  The same two individuals--based on clothing, height, and physical description--entered the store with a rifle, which was pointed at the employees and the cash register drawer was taken.  [*Id.* at 17].  At some point in either the first or the second robbery, the rifle was handed from one robber to the other.  [*Id.*].  Dukes' cell phone was detected in the vicinity of this robbery and in contact with Hearst's phone.  [*Id.* at 18].

In March 2018, Costa interviewed Mrs. Dukes, and she confirmed the phone number of Dukes' phone, and stated that Dukes was not home that night of the two robberies and she did not know what happened.  [*Id.* at 8-9].  The Smyrna Police

54

Department had earlier obtained historical cell site information for that phone number and provided the results to Costa, and Costa also received an order from federal court to obtain cell tower-dump information for cell towers in the vicinity of the robberies.  Dukes' phone was found to be in the vicinity of some of the robberies and in contact with phones associated with some of the codefendants at the time of some of the robberies.  [*Id.* at 10-11].  Specifically, Dukes' cell phone was active in the area shortly after the Waffle House robbery and again in the general area between his home, the Waffle House, and where the vehicle was located.  [*Id.* at 12].

A week prior to Dukes' arrest, on October 16, 2018, Costa accompanied local police to Dukes' home.  The local officers possessed an arrest warrant for Dukes based on the theft of an iPad, and also a search warrant for his residence.  [*Id.* at 23-26].  At that time, the local police showed Costa the cell phone taken from Dukes when he was arrested, and Costa dialed the number that he associated with Dukes from his investigation and the phone rang.  [*Id.* at 26].  He also noted that the phone had either a lion or tiger as the screensaver.  [*Id.* at 27].

Dukes was named in the federal superseding indictment and a warrant was issued for his arrest.  [*Id.* at 12].  It was executed on October 24, 2018 at 6:00 AM at Mrs. Dukes' house.   After Mrs. Dukes opened the door and responded

affirmatively that her son was home, the agents entered the residence. [*Id.* at 19-20]. Dukes was seen poking his head out of an upstairs bedroom, and an agent commanded him to show his hands. [*Id.* at 20-21]. Costa went upstairs and saw Dukes on the ground. His feet were in the threshold of the door and his body was in the hallway. One agent was outside the door and two agents were handcuffing him. Costa and a task force officer entered the bedroom to clear it. A cell phone was plugged in and laying on the bed. [*Id.* at 22]. After clearing other rooms, Costa went back into Dukes' room to accompany him getting dressed, because he had no clothes on when first encountered by the agents. [*Id.* at 22, 44]. Costa seized the phone as being evidence of the crime and in plain view. [*Id.* at 23-24]. Dukes was not *Mirandized* but was asked for the passcode to his phone. [*Id.* at 40]. Costa then confirmed that the passcode Dukes gave him unlocked the phone. [*Id.* at 27]. He later obtained a search warrant for the phone. [*Id.* at 27-28]. In order to search the phone, the passcode was used to open it. [*Id.* at 42].

### B. <u>ARGUMENTS OF THE PARTIES</u>

The government contends that the cell phone was lawfully seized pursuant to the plain-view doctrine because the agents were lawfully on the premises to arrest Dukes, Costa observed the cell phone in plain view on Dukes' bed, and its evidentiary value was immediately apparent since Costa had cell site information

and tower dump information linking Dukes' phone to a number of robberies and had seen a phone in Dukes' possession one week before. [Doc. 179 at 9-10 and citing *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1344-46 (N.D. Ga. 2016) (Thrash, J. *adopting* Vineyard, M.J.)]. It also argues that the phone was lawfully seized as incident to Dukes' arrest because it was within his grab area even though he was surrounded by police and handcuffed. [*Id.* at 12-13]. Further, it argues that even if a Fifth Amendment violation occurred because Dukes was asked for his passcode but he was not *Mirandized*, *United States v. Patane*, 542 U.S. 630 (2004), and this Court's decision in *United States v. Orozco Ramirez*, No. 117CR185LMMAJB01, 2019 WL 2165920, at *9 (N.D. Ga. Apr. 22, 2019), *report and recommendation adopted sub nom. United States v. Ramirez*, No. 117CR00185LMMAJB, 2018 WL 8337421 (N.D. Ga. May 17, 2018), hold that physical evidence discovered as a result of a voluntary but un-*Mirandized* statement is not subject to suppression, and Dukes' providing the passcode to Costa was voluntary. [Doc. 179 at 1-16]. In support of voluntariness, the government submits that these facts prove it: the initial entry and clearing of the house was completed, the agents helped Dukes put on clothing, "[n]o guns would have been drawn at this point, and agents did not use trickery or deception or make Dukes any promises to get him to disclose his passcode," he was taken out of the house

promptly and transported to the U.S. Marshals, and the only force applied was handcuffs.  [*Id.* at 17-18].

Dukes responds that the plain-view doctrine is inapplicable because it was not immediately apparent that the cell phone was the same one Dukes possessed the previous week and there was nothing inherently suspicious about the phone to justify its warrantless seizure, since, for example, this is not a drug case where cell phones are known tools of participants.  [Doc. 180 at 4-6].  He also argues that the phone was not properly seized incident to his lawful arrest since Dukes already had most of his body outside of his bedroom, he was face-down and handcuffed, and it was only seized when he was brought back into the bedroom to get dressed, and thus was not " 'substantially contemporaneous' " with his arrest.  [*Id.* at 6-7].  He also argues that the government has not established that his statement in which he gave the agents the passcode was voluntary, since he was awakened in the early morning hours by numerous armed law enforcement officers, who yelled during their entry and sweep of the house, and he was taken to the ground, handcuffed, and restrained, and after he was dressed in the company of the agents, they directed him to provide his passcode.  [*Id.* at 10-11].  Finally, Dukes argues that Costa's unlocking the phone without a warrant was an integral-inseparable part of the

search itself, and thus violated *Riley v. California*, 573 U.S. 373 (2014). [Doc. 180 at 11-13].

In reply, the government argues that Dukes places too high a burden on it by contending that it needed to prove that the phone seized on October 24 was the same one Costa saw on October 16, arguing that like the rejected argument in *Rodriguez-Alejandro*, he is placing too high a burden on the government. [Doc. 182 at 2]. It also contends that Dukes provided the passcode voluntarily, and the mere fact that he was under arrest does not establish the necessary coercion. [*Id.* at 3-4]. It also argues that Costa's confirming that the passcode opened the phone was not a search, and thus *Riley* is distinguishable. [*Id.* at 4-5].

## C.   <u>DISCUSSION</u>

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause." *United States v. Magluta*, 418 F.3d 1166, 1182

59

(11th Cir. 2005).  Evidence obtained in violation of the Fourth Amendment must be suppressed.  *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991).  Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson*, 482 F.2d 197 (5th Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009).  Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

   "Plain view" is an exception to the Fourth Amendment's prohibition against seizures without a warrant.  *Horton v. California*, 496 U.S. 128, 134 (1990).  The "plain view" exception permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and has a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.  *Id.* at 136-37; *United States v. Hromada*, 49 F.3d 685, 690 n.11 (11th Cir. 1995).  In addition to contraband, *United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir. 1991), law enforcement may

seize items discovered in plain view if probable cause exists to believe the items are evidence of criminal activity.  *See Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (reconsidering the "immediately apparent" language in *Coolidge v. New Hampshire,* 403 U.S. 443 (1971), and substituting a less rigorous probable-cause standard for plain-view seizures).  Probable cause to seize an item in plain view exists whenever the facts available to the searching officer support a reasonable belief that the item may be contraband, stolen property, or evidence of a crime.  *Id.* at 742; *see also United States v. Ladson*, 774 F.2d 436, 439 (11th Cir. 1985) (stating that, for the plain view exception to apply, "it must have been immediately apparent that the item was evidence, contraband or otherwise subject to seizure").

Here, first, there is no dispute that Costa and the other law enforcement agents were legitimately on the premises, since they possessed an arrest warrant for Dukes and Dukes resided at his mother's.  *Payton*, 445 U.S. at 602-03 (holding that arrest warrant in and of itself justifies the physical intrusion of a suspect's home to effect his arrest, provided the officers reasonably believe the suspect is likely at his residence).  Second, there is no dispute that the cell phone was in plain view, in that it was laying on the bed in the room in which Dukes had just been sleeping, and was observed by Costa either initially when Dukes was arrested or when he entered the room as Dukes was getting dressed.

61

Third, the Court concludes that the government has the better argument as to the lawfulness of the seizure of the cell phone. There was probable cause to believe that the cell phone contained evidence of a crime. Costa knew that Dukes' cell phone (or better, the phone number associated with the phone) that Dukes possessed just the week before was the same phone/phone number that was in communication with codefendants in close temporal proximity to the robberies, and also was in close physical proximity to cell towers in the area of the robberies. It similarly was reasonable[20] for an agent to surmise that Dukes' possession of the same phone/phone number between the time he was involved in the robberies early in 2018 and on October 16, 2018 made it unlikely that he had changed phones or phone numbers within such a short period of time between October 16 and 24, 2018.

_____

[20]     Probable-cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g.*, *Wren v. United States*, 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton*, 496 U.S. at 138 ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

The Court similarly agrees with the government that Dukes attempts to place too high a burden on the government in the plain-view exception context.  As the court remarked in *Rodriguez-Alejandro*, where the defendant argued that the agents could not tell whether all four cell phones belonged to him in light of the multiple phones and other persons in the room when he was arrested, Dukes

> is attempting to place a higher burden on the government than is necessary for application of the plain view exception.  . . .  [T]he phrase "immediately apparent" does not imply "that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Texas v. Brown*, 460 U.S. 730, 741 [ ] (1983).  The police are required only to have probable cause to believe that the object they are viewing is contraband or evidence of a crime. *Id.* at 741-42[ ]; [*Arizona v.*] *Hicks*, 480 U.S. [321,] 326 [(1987)] [ ]; *United States v. Smith*, 459 F.3d 1276, 1290- 91 (11th Cir. 2006).

*Rodriguez-Alejandro*, 664 F. Supp. 2d at 1346.  Therefore, the phone was properly seized under the plain-view exception.[21]

_____

[21]     Since the Court recommends that the District Judge find that the cell phone was properly seized under the plain-view exception, the Court need not discuss in depth the government's alternative argument that the phone was properly seized incident to Dukes' lawful arrest.  A custodial arrest of a suspect based on probable cause is considered a reasonable intrusion under the Fourth Amendment, and thus a search incident to the arrest requires no additional justification. *United States v. Robinson*, 414 U.S. 218, 235 (1973).  The "search incident to arrest" is a limited exception; it "places a temporal and a spatial limitation on searches incident to arrest, excusing compliance with the warrant requirement only when the search 'is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.' " *New York v. Belton*, 453 U.S. 454, 465 (1981) (citations

Next, the Court concludes that asking Dukes for the passcode to his cell phone without first obtaining his *Miranda* waiver mandates the suppression of his statement informing Costa of the passcode. The Fifth Amendment's prohibition against compelled self-incrimination requires that a person taken into custody must be advised of his or her right to remain silent and his or her right to counsel prior to an interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *United States v. Levi*, 762 Fed. Appx. 778, 783 (11th Cir. Feb. 28, 2019). Further, courts have recognized that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment. *See, e.g.*, *United States v. Doe (In*

───────────────────

omitted), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). Under this exception to the warrant requirement, officers may only search areas "within [the arrestee's] immediate control" construed as "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). This rule is applicable even when the defendant is restrained. *United States v. Jones*, 218 Fed. Appx. 916, 919 (11th Cir. Feb. 27, 2007) (upholding search of bag in hotel room incident to arrest even though defendant was handcuffed and recognizing other courts' similar conclusions). Whether during Dukes' initial arrest or when he was returned to inside the bedroom to get dressed, the cell phone was in Dukes' "grab area." *United States v. Ricks*, 817 F.2d 692, 696 (11th Cir. 1987) (scope of search incident to arrest is limited to "grab area" within suspect's immediate reach, which "has been construed to mean 'the area from which [the defendant] might gain possession of a weapon or destructible evidence' ") (alteration in original) (quoting *Chimel*, 395 U.S. at 763). Therefore, even if plain-view does not countenance the seizure of Dukes' cell phone, the search-incident-to-lawful-arrest exception to the warrant requirement does.

64

*re Grand Jury Subpoena Duces Tecum)*, 670 F.3d 1335, 1346 (11th Cir. 2012) (holding that Doe's "decryption and production of the contents of the hard drives would sufficiently implicate the Fifth Amendment privilege" because the "decryption and production would be tantamount to testimony by Doe of his knowledge of the existence and location of potentially incriminating files; of his possession, control, and access to the encrypted portions of the drives; and of his capability to decrypt the files"); *United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. 2020) ("Whether the defendant is forced to reveal his passcode or unlock the phone in the presence of law enforcement . . . would force defendant to 'disclose the contents of his own mind' and accordingly are testimonial acts violating the Fifth Amendment.") (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)); *United States v. Mendez-Bernal*, No. 319CR00010TCBRGV, 2020 WL 6495109, at *17 (N.D. Ga. July 22, 2020) (holding that " 'police questioning asking for [defendant's] cell phone passcode, and [his] act of providing the passcode,' is due to be suppressed") (quoting *Carter v. Davids*, Case No. 1:19-cv-555, 2019 WL 6001698, at *13 (W.D. Mich. Nov. 14, 2019)), *report and recommendation adopted*, No. 3:19-CR-10-TCB, 2020 WL 5494728 (N.D. Ga. Sept. 11, 2020); *United States v. Maffei*, Case No. 18-CR-00174-YGR-1, 2019 WL 1864712, at *6 (N.D. Cal. Apr. 25, 2019) (finding that forcing the

defendant to provide her cellphone passcode was testimonial, but ultimately concluding that it did not violate the Fifth Amendment because it was not compelled, though the district court still suppressed the defendant's statement of her passcode for violating her Fourth and Sixth Amendment rights); *United States v. Sanchez*, 334 F. Supp. 3d 1284, 1295-96 (N.D. Ga. 2018) (holding that "the facts in this case show that Defendant's production of his cellphone passcode was compulsory within the meaning of the Fifth Amendment); *In the Matter of the Search Warrant Application for [redacted text]*, 279 F. Supp. 3d 800, 806 (N.D. Ill. 2017) (explaining that the "principle [articulated by the Supreme Court in *Doe v. United States*, 487 U.S. 201, 210 n.9 (1988)] applies here: a person generally cannot be compelled to disclose the passcode [to a phone]"); *SEC Civil Action v. Huang*, No. 15-269, 2015 WL 5611644, at *1-4 (E.D. Pa. Sept. 23, 2015) (finding the defendants could invoke their Fifth Amendment right against self-incrimination to challenge production of their smartphone passcodes because production of passcodes was testimonial in nature); *United States v. Kirschner*, 823 F. Supp. 2d 665, 669 (E.D. Mich. Mar. 30, 2010) (quashing subpoena for testimony about computer password on Fifth Amendment grounds because the government sought to require the defendant "to divulge through his mental processes his password – that will be used to incriminate him").

66

Nonetheless, suppression of Dukes' statement about the passcode does not lead inexorably to suppression of the contents of the cell phone. Not every violation of *Miranda* requires suppression of the evidence obtained. *Missouri v. Seibert*, 542 U.S. 600, 602 (2004). Thus, the Supreme Court has held that the Self-Incrimination Clause in the Fifth Amendment does not bar the admission of physical evidence that is the fruit of an unwarned but voluntary statement. *United States v. Jackson*, 506 F.3d 1358, 1360-61 (11th Cir. 2007) (citing *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion); and *Patane*, 542 U.S. at 645 (Kennedy, J., concurring in the judgment)).

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).

67

Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996) (illustrating factors properly to be considered in totality-of-the-circumstances inquiry), *overruled on other grounds by Arizona v. Gant,* 556 U.S. 332 (2009). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a sine qua non of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

68

In determining whether a defendant's will was overborne, the Court must assess "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226. Because it is appropriate to consider the suspect's individual characteristics (e.g., age, education, and intelligence), the test for voluntariness (unlike the *Miranda* custody test) involves a subjective inquiry. *Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004). But while a defendant's individual characteristics may suggest that he was especially susceptible to police coercion, or even that he lacked the volitional ability to make a free and rational choice, the defendant's confession is nevertheless voluntary unless the police exploit that susceptibility or mental weakness with coercive tactics. *Connelly*, 479 U.S. at 161-65; *id.* at 170 (the voluntariness inquiry "depend[s] on the absence of police overreaching, not on 'free choice' in any broader sense of the word"). Of course, any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *see also Ramirez*, 2019 WL 2165920 at *8-9.

The Court concludes that Dukes' statement providing the passcode to his cell phone was voluntary. First, in any arrest there is present a degree of duress. The

69

question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the consent. *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973); *see also United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) (quoting *Jones*, 475 F.2d at 730).  However, there is no evidence that the agents in this case used any more force than necessary to gain entry to the residence, secure it, and arrest Dukes.  Although the record is silent as to Dukes' age or education level, he was questioned in his own (and his mother's) home. There is no evidence that law enforcement were brandishing any weapons at him at the time.   As Costa described the encounter:

> I literally said, hey, what's the passcode to your phone, and he gave it to me.  I think that at one point I think he mixed up the numbers a little bit, but then he got it right and gave me the passcode.

[Doc. 161 at 42].  Dukes has pointed to no susceptibilities of which the police took advantage.  He was not subjected to lengthy interrogation and in fact the entire encounter was brief.  All of these circumstances demonstrate that other than the arrest situation itself, the environment was not coercive.   Therefore, Dukes' statement providing the passcode was voluntary.

Finally, the Court disagrees with the government and concludes that Costa's warrantlessly checking the phone to see if the passcode would unlock it, even if he conducted no further intrusion, was in fact a search, just as inserting a key into a

70

door lock or using a key fob to unlock a door constitutes a search.  *United States v. Dixon*, 984 F.3d 814, 820 (9th Cir. 2020) (insertion of key into minivan's lock constituted search within meaning of Fourth Amendment); *United States v. Correa*, 908 F.3d 208, 221 (7th Cir. 2018) (using the key fob to enter the locked building lobby and testing the mailbox key were searches); *United States v. Bain*, 874 F.3d 1, 15-16 (1st Cir. 2017) (testing key in lock is search); *see also United States v. House*, No. CR 19-96-BLG-SPW, 2019 WL 6842418, at *3 (D. Mont. Dec. 16, 2019) (holding that police inserting a key into a home's lock is a search); *but see United States v. Wheeler*, No. 16-3780, 2021 WL 4129731, at *13 (3d Cir. Sept. 10, 2021) (citing cases holding that inserting key either is not a search or is minimally invasive); *United States v. Jackson*, No. CR 21-051 (DWF/TNL), 2021 WL 4892223, at *2 (D. Minn. Oct. 20, 2021) ("The Court also agrees that simply using a passcode to unlock Defendant's cellphone without exploring the contents of the phone does not constitute a search under the Fourth Amendment.") (citing *Riley*, 573 U.S. at 388-89).

The Eleventh Circuit's decision in *United States v. Dasinger*, 650 Fed. Appx. 664, 671-72 (11th Cir. May 24, 2016), does not compel a contrary result.  In that case, officers arrested Dasinger in a motel room for drugs.  Vehicle keys were located in the room but she initially stated that she got a ride to the motel

and the keys weren't hers.  She then stated that the keys were hers but that the vehicle was not on the premises.  One officer pressed a button on one of the key fobs and heard an alert from a vehicle in the parking lot, while another officer noticed a vehicle in the lot respond to the fob.  A drug dog alerted to that vehicle, which was then searched and drugs were found inside.  *Id.* at 667-68.  The Eleventh Circuit assumed for purposes of its analysis that the officer's handling of the keys and key fob was a search or seizure under the Fourth Amendment, *id.* at 671, but then considered whether it amounted to an unlawful search, and in doing so, advised that the test was one of reasonableness.  *Id.*  The court then concluded that the officer's manipulation of the keys and key fobs for a few seconds was not unreasonable given the presence of drug-distribution paraphernalia in the hotel room but no drugs were found.  *Id.* at 671-72.

The *Dasinger* court did not address *Florida v. Jardines*, 569 U.S. 1, 9-10, 11 (2013), where the Court made clear that when a law enforcement officer physically intrudes on the curtilage of a residence to gather information, a search within the meaning of the Fourth Amendment has occurred.  Arguably *Dasinger*'s result can be explained because depressing the key fob did not involve a physical intrusion as occurred in *Jardines* or that which occurred in the present case by getting to the unlocked home screen of Dukes' phone after typing in the passcode.

72

The Court concludes that *Jardines* supports a finding that using a passcode to open a phone constitutes a search since it is a physical trespass into what otherwise would be private content on the phone.

Nonetheless, Dukes is not entitled to any relief for this warrantless intrusion, because Costa obtained no information from his actions other than confirmation that the cell phone was capable of being unlocked with this passcode.  In his subsequent affidavit in support of the search warrant for the phone, Costa did not mention to the issuing judge that Dukes gave him the passcode or that he unlocked it temporarily using the passcode.  *See* Govt. Ex. 2 (No. 1:18-MC-1693 (N.D. Ga. Nov. 9, 2018)).  Therefore, the search of the phone by warrant was not tainted by Costa's earlier opening of the cell phone with the passcode.

Accordingly, the undersigned **RECOMMENDS** that Dukes' motion to suppress evidence, [Doc. 146], be **GRANTED** insofar as Dukes' un-*Mirandized* statement as to his cell phone passcode, but **DENIED** as to the search of his cell phone by search warrant.

## VII.   DUKES' MOTION TO SUPPRESS DNA RESULTS, [DOC. 148]

In this motion, Dukes complains that he was compelled to give a DNA sample, but at the pretrial conference, the government explained, and Dukes did

not challenge, that the DNA was obtained via a search warrant. [Doc. 150]. Dukes did not attack the warrant in his motion. [*See* Doc. 148].

Dukes also asserted at the pretrial conference that the DNA swab violated his Fifth Amendment rights against self-incrimination, but such a claim is also without merit. The Fifth Amendment is not implicated by the warranted buccal swab because "neither the furnishing of consent to collect DNA, nor the DNA evidence itself, is testimonial or communicative." *Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d 1212, 1244 (11th Cir. 2015) (citation omitted).

As a result, the undersigned **RECOMMENDS** that Dukes' motion to suppress DNA evidence, [Doc. 148], be **DENIED**.

## VIII. <u>CONCLUSION</u>

For all of the above reasons, the undersigned **RECOMMENDS** as follows:

1.      Hearst's motion and amended motion to suppress historical cell-site locational data, [Doc. 46, 60]; Henry's motion to suppress cell site data, [Doc. 56]; and Dukes' motion to suppress phone data, [Doc. 147], be **DENIED**;

2.      Hearst's motion and amended motions to suppress evidence, [Docs. 47, 59, 70], be **DENIED**;

3.      Hearst's motion and amended motion to suppress identification testimony, [Doc. 49, 137], be **DENIED**;

4.      Hearst's motion to sever defendant and exclude out-of-court statement of co-defendants, [Doc. 51], be **DENIED IN PART AS MOOT AND GRANTED IN PART**;

5.      Hearst's motion and amended motion to dismiss Counts Two, Four, Six, and Eight, [Docs. 52, 62]; and Henry's motion to dismiss Counts Four, Six, and Eight, [Doc. 57], be **DENIED**;

6.      Dukes' motion to suppress evidence, [Doc. 146], be **GRANTED** as to the statement about his cell phone's passcode but **DENIED** in all other respects;

7.      Dukes' motion to suppress DNA evidence, [Doc. 148], be **DENIED**; and

8.      Henry's pro se "Amendment to Counsel's Motion to Suppress," [Doc. 191], and "Pro Se Motion of Defendant Cedvonte Henry Pursuant to Fed. R. Crim. P 12(b)," [Doc. 204], be **DENIED**.

The Court has now ruled upon, or recommended a ruling upon, all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014).  As a result, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this 10th day of March, 2022.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

75